# CLAIM FOR DAMAGE, INJURY, OR DEATH

| | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROROVED OMB NO. 1105-0008 EXPIRES 6-30-01 |
|---|---|---|

**1. Submit To Appropriate Federal Agency:**
Department of Health and Human Services
Claims Branch
5600 Fishers Lane, Parklawn Building, Room 5C10
Rockville, Maryland 20857
See Attached.

**2. Name, Address of claimant and claimant's personal representative, if any. (See instructions on reverse.) (Number, street, city, State and Zip Code)**
Z█████ B████, by his mother & next friend, Tara Kilmer,&Tara Kilmer individually, 19 Elm St., Apt.2, Whitefield, NH 03598

| 3. TYPE OF EMPLOYMENT<br>MILITARY   CIVILIAN   N/A | 4. DATE OF BIRTH ██████ | 5. MARITAL STATUS Single | 6. DATE AND DAY OF ACCIDENT See Attached. | 7. TIME (A.M. OR P.M) am & pm |
|---|---|---|---|---|

**8. Basis of Claim** *(State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof) (Use additional pages if necessary.)*

See Attached.

**9. PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT*(Number, street, city, State, and Zip Code)*

N/A

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. *(See instructions on reverse side)*

N/A

**10. PERSONAL INJURY/WRONGFUL DEATH**

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT

See Attached.

**11. WITNESSES**

| NAME | ADDRESS*(Number, street, city, State, and Zip Code)* |
|---|---|
| See Attached. | |

**12. (See instructions on reverse)    AMOUNT OF CLAIM(in dollars)**

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL *(Failure to specify may cause forfeiture of your rights.)* |
|---|---|---|---|
| None | See Attached. | None | See Attached. |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE ACCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT *(See instructions on reverse side.)* Michael P. Hall, Esq. *[signature]* Attorney for Z█████ B████ & Tara Kilmer | 13b. Phone number of signatory (603) 669-8080 | 14. DATE OF CLAIM See Attached. |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant shall forfeit and pay to the United States the sum of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the United States *(See 31 U.S.C. 3729.)* | Imprisonment for not more than five years and shall be subject to a fine of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the United States *(See 18 U.S.C.A. 287.)* |

95-108
Previous editions not usable

NSN 7540-00-634-4046

STANDARD FORM 95 (Rev. 7-85)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

Attachment 1

## 6.   Date and Day of Accident

From ▇▇▇▇ (Z▇▇▇▇'s date of birth) through 4/10/98 (when Z▇▇▇ suffered brain

damage and blindness from shaking) including but not limited to 3/25/98 and 4/2/98 (when

Ammonoosuc's employees noted Z▇▇▇ was lethargic, developmentally delayed, irritable and

unwell but did not arrange further evaluations).

4

## 8. Basis of Claim

In the fall of 1997, Ammonoosuc agreed to provide services to Z████ B██ and his parents for the purpose of protecting Z████ from child abuse and neglect and to satisfy Z████'s health care needs. The services to be provided by Ammonoosuc included in-office medical care, home visits by social workers for instructing Z████'s parents in anger management and safe parenting techniques, and home visits by registered nurses for the purpose of evaluating Z████'s condition. Ammonoosuc breached contractual duties and violated duties of reasonable care owed to Z████ B██ and his parents because Ammonoosuc (1) failed to provide parenting instruction to Z████'s father, Adam Boyer, to help him control his anger and to improve his ability to provide safe parenting to Z████; (2) failed to properly coordinate care provided by its doctors, nurses and social workers; (3) failed to arrange proper medical evaluation on March 25, 1998, when their social worker, Jacqueline Poulton, noted Z████ was "lethargic, limp, half awake, fussing softly" and again failed to arrange proper medical evaluation on April 2, 1998, when their visiting nurse, Shirley Warner, became concerned about Z████ because he was developmentally delayed, lethargic, stiffening, irritable and appeared abnormal and unwell, all of which was evidence of potentially serious illness, including the possibility of traumatic brain injury; and (4) failed to investigate and report evidence of possible child abuse or neglect. Ammonoosuc's breach of duties caused Z████'s father not to receive the instruction and support he needed for safe parenting of Z████, caused Z████ to remain in the custody of his father, and contributed to cause Z████ to be subjected to multiple episodes of neglect and abuse, including an episode of severe shaking on April 10, 1998, which shaking episode caused brain damage and blindness. CAT scans taken after the April 10 shaking incident showed evidence of new brain injuries as well as old brain injuries dating back prior to

March 25, 1998.  Therefore, if there had been proper evaluation of Z█████ soon after the March 25 and April 2 home visits, Z██████'s "old" brain injuries probably would have been discovered, and intervention probably would have occurred, which would have protected Z██████ from the additional brain damage and blindness caused by the severe shaking episode on April 10.  See supporting expert opinion from Deborah Parks, RN, DNS, PNP (Attachment 1).

RECEIVED

JAN 25  11 3.  AH '02

ACE
ACQUISI
CLAI
ROOM

6

## 10.    Personal Injury/Wrongful Death - Nature and Extent of Each Injury

Z█████'s injuries include brain damage, retardation, seizures, spastic quadriparesis, hypertonicity, deafness, and blindness as a result of which Z█████ presently has global developmental delays, impaired ability to walk and grasp, and severely limited ability to interact with his environment.  See September 29, 1998 report from Z█████'s neurologist, Dr. Nordgren, which is Attachment 2, and most recent assessment from Z█████'s pediatrician, Dr. Williams, dated October 1, 2001, which is Attachment 3, plus report of rehabilitation specialist, William Burke, Ph.D., which is Attachment 4.

7

**12b./12d.**   <u>Amount of Claim - Personal Injury/Total</u>

$14,110,647 for Z█████ B█████ consisting of $10,986,647 for attendant and supportive care to allow Z█████ to live in a home environment after age 21 (see Attachment 4, report and curriculum vitae of William Burke, Ph.D.); $1,124,000 for loss of earning capacity (see Attachment 5, report and curriculum vitae of Arthur Kenison, Ph.D.); $1,000,000 for Z█████'s pain and suffering; and $1,000,000 for Z█████'s loss of enjoyment of life.

$1,365,382 for Tara Kilmer for extraordinary medical care, attendant care, and respite care expenses to be incurred during Z█████'s minority. See Attachment 4, report and C.V. of William Burke, Ph.D. In addition, Z█████'s medical expenses to date resulting in whole or in part from injuries caused by the April 10 shaking episode total $90,300.00. See Attachment 10.

The cost of future care as projected by Dr. Burke's report (Attachment 4), has been attributed to Tara Kilmer's claim until Z█████ is 18 because parents are legally responsible for care of their children during their minority. <u>Blue Cross/Blue Shield of New Hampshire-Vermont v. St.Cyr</u>, 123 N.H. 137, 141, 459 A.2d 226 (1983). After Z█████ reaches age 18, the cost of his future care as projected by Dr. Burke has been attributed to Z█████'s own claim. Dr. Burke's report does not account for inflation or discounting to present value. Plaintiffs reserve the right to offer expert opinions from an economist regarding the extent to which these amounts should be increased for inflation and discounted to present value to accurately reflect the losses and expenses in question.

RECEIVED

# DARTMOUTH-HITCHCOCK MEDICAL CENTER

## Inpatient Progress Notes



50 09 60 41 -4

8▮▮▮ . Z▮▮▮▮▮▮

(addressograph)

4/11/98  PICU attending note

2015    6 month old boy admitted to PICU for observation and treatment of intracranial hemorrhage, suspected shaken baby. Transported from Dr. Williams at Littleton hospital this afternoon for vomiting and extreme lethargy. I saw this pt in ED at 1745 with Dr. Shipman, reviewed the CT scan c̄ radiology and presented the parents with the findings and informed them about PICU admission and the report for suspected abuse to DCYF. Social worker on call notified.          2 weeks ago
Z▮▮▮▮▮ was in apparent good health until ~~yesterday~~ when he had the "flu" and ear infection. At that time mother also noted a bulge on his head (identifies it today as the anterior fontanel). She took him to see his MD, was told the bulge was normal, started Amoxicillin. Mom and Dad both denies any trauma at this time, except maybe he hit himself on their bed (The baby's crib was right next to their bed). He had improved this last week, improved feeding (bottle) but still fussy. Yesterday (4/10) he did not seem himself, ↓ alertness, crying. Brought him to ED, no specific findings (apparently had an CX). Discharged at 12m. Woke up ~ 2AM crying, vomiting. No bottle since 8PM the previous night. The father brought him back to ER later this morning ~ 12 Noon sleeping a lot - not taking any po - responsive to pain only, faint cry, but fontanel bulging. LP done in Littleton: RBC 2.29 mil / WBC 5400, hemorrhage. transferred to DHMC to r/o ICH, hydrocephalus, meningitis. CT scan on arrival here showed bilateral subdural

F-107

hygromas, enlarged ventricles, areas of hypodensities (see radiology report for details). CT scan also showed ⑧ retinal hemorrhage. Long bone xray, CXR ⊖, bone scan, MRV pending.

Exam (1800): Very lethargic, irritable infant. moves to ~~touch~~, rhythmic seizures of Ⓡ hand

HR 140   RR 30   BP 77/48

HEENT: Very large firm bulging fontanel (4x6 cm) split sutures. Eyes closed, pupils unequal Ⓡ 3m Ⓛ 4m Ⓡ reactive, Ⓛ unreactive to light. small petechiae over bridge of nose, small bruise on Ⓛ cheek (8 mm) intact palate

Chest: Symmetrical. No external evidence of injury. Clear, equal breath sounds

Cor: ul s₁,s₂  no m

Abd: soft, scaphoid, no masses

Genitalia: Testes ↓↓ circumcised. No evidence of trauma no evidence of perineal injury

Extremities: small 1cm bruise on Ⓛ thigh. Ⓡ hand clonic movement, no other injures noted

Reflexes, by neuro resident: UE, ul symmetrical LE Ⓛ K 3, R K 2, plantars ↑ on Ⓛ

PMH: Born at 41 whs gest to a 23 y o G₂ P₀ mom c̄ gest. diabetes Newborn period complicated by hypoglycemia and hypocalcemia; also had sepsis w/u. Treated c̄ IV glucose and abs Home at 5 days of age. Followed by pediatr. Bottle, Imm UTD Brought to ED at 4 months for bruises on his buttocks, parents had no explanation — they just suddenly appeared when mom was changing diapers. Otherwise no illness until present.

# DARTMOUTH-HITCHCOCK
## MEDICAL CENTER

### Inpatient Progress Notes



50 09 60 41 - 4

B████, Z████

(addressograph)

4/11/98 (cont)

SH. Z████ lives ē parents in Lisbon. No other sibs. Mom works in restaurant in Lisbon. Dad in manufactur plack. Z████ goes to baby sitter every Thursday, otherwise cared for by Mom or Dad.

Parents both deny any trauma. They have not been able to reach sitter to ask her. When they were told about the brain scan and that the injuries were most likely inflicted by an adult person, Mom said "I would never hurt him" – Dad did not say anything. Mom asked "Could he die from this?" I answered "It is possible he could die. He will most certainly have brain damage". Mom replied "That's no problem, I can deal with brain damage". She had an unappropriate affect during the hour in the ER. Laughing at times. Chatting. Dad seemed distraught. Talked very little.

Pt. transferred to PICU at 7 PM.

Plan: ① Monitor cardiovascular and neuro status
② NPO – iv fluids
③ Shaken baby protocol – in progress
④ Neurosurgery consult. in AM
⑤ Ophthalmology consult in AM
⑥ OCYF notified.

Stuart Worsley MD